# THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

**DELCA I. ORTIZ-SANTIAGO, et al.,**

    **Plaintiffs,**

    v.

**HOSPITAL EPISCOPAL SAN LUCAS, INC., et al.,**

    **Defendants.**

Civil No. 16-1099 (ADC)

## OPINION AND ORDER

The Court held an evidentiary hearing on August 14, 2018, aimed at answering whether defendants Hospital Episcopal San Lucas, Inc. ("Hospital"), Dr. Guillermo E. Bolaños-Ávila ("Dr. Bolaños"), and Dr. Edgardo Bermúdez-Moreno ("Dr. Bermúdez") were covered by the cap on damages available under Puerto Rico law in cases involving Regional Academic Medical Centers ("RAMC"). *See* P.R. Law Ann. tit. 24 § 10035 ("RAMC statute"). **ECF No. 110**. For the reasons explained below, the Court holds that the statutory cap on damages **applies** to Dr. Bolaños, Dr. Bermúdez, and the Hospital in relation to Dr. Bolaños's and Dr. Bermúdez's care of Irma Santiago-Sáez ("the patient"), but does not apply as it relates to care otherwise rendered by co-defendant Dr. Santiago Báez-Torres ("Dr. Báez").

I. **Background**

The Court denied the Hospital's motion for partial summary judgment, which was joined by Dr. Bolaños and Dr. Bermúdez, on the basis that the motion failed to establish that the medical treatments at issue were administered within the exercise of "teaching duties," a requirement under the RAMC statute.[1] *See* P.R. Law Ann. tit. 24 § 10035; **ECF No. 91** at 6–7. The Court ruled that the Hospital's status as a RAMC and Drs. Bolaños and Bermúdez's employment as faculty members, without more, did not resolve this material question, particularly where the uncontested evidence submitted by the Hospital indicated that (1) the Hospital employed physicians who were not part of the teaching faculty and, (2) the defendant doctors did not all or exclusively perform teaching duties at the Hospital, but maintained private practices with admitting rights at the Hospital. **ECF No. 91** at 7–9.

During a settlement conference following the Court's denial of the motion for partial summary judgment, the parties agreed it would be beneficial to conduct an evidentiary hearing on the applicability of the statutory cap on damages. The parties agreed to the evidentiary hearing setting and time was allocated for specific discovery on the subject. Plaintiffs subsequently objected to the hearing in a written motion to vacate, **ECF No. 95**, which Dr. Bolaños opposed, **ECF No. 98**. The Court denied plaintiffs' motion, noting that the parties had

---

[1] For the sake of brevity, the Court incorporates the statement of uncontested facts contained in the Opinion and Order denying partial summary judgment. **ECF No. 91**. Most notable in that statement of uncontested facts is the parties' agreement that the Hospital is part of the RAMC program. *Id.* at 3.

previously expressed mutual assent to an evidentiary hearing. **ECF No. 96**. The Court also referenced its discretion to manage its docket to facilitate the efficient and expedient resolution of cases. *Id*. The Court considered the hearing an expeditious means of resolving the statutory cap issue and a necessary means of streamlining the parties' evidence for trial. *Id*. at 3. At plaintiffs' request, the Court afforded the parties an opportunity to conduct additional discovery before the hearing. **ECF No. 99** at 1–2.

On August 14, 2018, the Court heard testimony from four witnesses over the course of approximately three-and-a-half hours: Dr. Olga Rodríguez-Rodríguez ("Dr. Rodríguez"), Dean of the Ponce School of Medicine and Health Services ("the University") since 2012 and President of the Southwest RAMC; Dr. Bolaños; Dr. Bermúdez; and Dr. María Valentín Mari ("Dr. Valentín"), the current Director of Graduate Medical Education and part of the internal medicine residency program.

Dr. Rodríguez testified first. She explained the history of the RAMC program and the health law reforms undertaken on the island in the late 1990s. She explained the Hospital's affiliation with the University, describing it as one of the primary teaching hospitals affiliated with the school, which affiliation began around 2000. The witness reviewed a "consortium agreement," admitted as **Exhibit 1**, explaining that the agreement memorializes this relationship. Though the agreement is dated in 2012, she explained that the time gap reflects the period during which the RAMC law was not yet in effect. Once the law took effect in 2006, and after amendments in 2011, she explained, the entities desired to clarify in writing that the

Hospital is a part of the RAMC program and eligible for the cap on damages created by the RAMC statute. According to Dr. Rodríguez, the consortium agreement memorializes the legal protections afforded to the Hospital under the RAMC program. Dr. Rodríguez explained that, for the physicians at the Hospital to be eligible for the cap on damages, they must have an academic appointment at the University. She testified that both Drs. Bolaños and Bermúdez have academic appointments at the University. Dr. Rodríguez testified that Dr. Bolaños has been a member in good-standing of the University's faculty since 1997 and a member of the RAMC since 2008. **Exhibit 2**.

On cross examination, plaintiffs' counsel challenged Dr. Rodríguez's qualifications to interpret the law, such as the scope of the RAMC statute. But, Dr. Rodríguez clarified that she was active in the legislative process for the RAMC statute and is President of the Southwest RAMC Board, which, by statute, is empowered to implement the chapter containing the RAMC provisions in the Puerto Rico Code. *See* P.R. Laws Ann. tit. 24, § 10034(a). Thus, although the Court agrees that it is in no way bound by Dr. Rodríguez's interpretations of the law, her understanding of how the RAMC program operates is not unfounded. Dr. Rodríguez was credible; she spoke confidently and clearly. She had a clear command of the information to which she testified. She does have a tangential stake in the outcome of this case to the extent the Court's decision may confirm or undermine her belief as to how the RAMC statutory cap on damages operates in relationship to her and the medical and teaching entities with which is she is affiliated.

Dr. Bolaños testified next. He verified that he has been part of the University faculty since 1997, a professor in the surgery department since 2004, and a member of the Southwest RAMC since 2008. **Exhibit 2**. As a member of the surgery faculty, he explained that he supervises medical residents specializing in surgery and that he did so during the timeframe relevant to this case. He also confirmed he remembered the patient in this case, and he confirmed the identity of several residents that attended to the patient under his supervision, such as Dr. Rafael Santini-Domínguez, Dr. Gabriel De La Torre-Bisot, and Dr. Luís E. Santaliz-Ruíz. **Exhibits 3, 5, 9, 10.**

Defense counsel presented Dr. Bolaños with several pages of the patient's medical record from her stay at the Hospital, to demonstrate that Dr. Bolaños was either directly or indirectly supervising surgery residents in all care rendered to the patient because the residents' signatures on the medical records were often accompanied by Dr. Bolaños's countersignature. For example, Dr. Bolaños confirmed that he countersigned the Consultation Report in the patient's medical record, dated January 24, 2015, that was completed by a resident he supervised. **Exhibit 3**. He pointed out his countersignature on the January 25, 2015 Progress Note in the patient's record that was completed by one of the residents he supervises, Dr. Santini. **Exhibit 4**. Likewise, he described the January 27, 2015 Progress Note in the patient's medical record as completed by a resident under his supervision, Dr. De La Torre. **Exhibit 5**. He confirmed that he personally completed and signed the Progress Note in the patient's medical record dated February 3, 2015. **Exhibit 6**.

Dr. Bolaños testified that he generally supervises five or six medical residents at a time and that he supervises everything they do. He testified that he will directly evaluate patients with the residents and that more experienced residents are authorized to visit patients without his direct supervision, but they must still consult with him. He indicated that among other things, he teaches the residents how to complete paperwork, notes, and speak with the patients, among other things.

In response to plaintiffs' counsel's questions on cross-examination, Dr. Bolaños testified that there is not always documentation to memorialize when he is physically present with the residents while attending to a patient versus when he may have reviewed the residents' work or consulted with them indirectly. Dr. Bolaños clarified that there are several levels of the residency programs and individuals in higher ranks have more experience and, consequently, they are authorized to administer more types of care without his direct supervision, though always with his indirect supervision. The residents must pass certain thresholds to be able to move up in the ranks and acquire greater independence. He explained that the residents, regardless of what level they are at, are still required to discuss patients' statuses and consult with him.

Dr. Bolaños testified that he was brought in as a consultant in this case to address two specific medical issues the patient presented. He testified that this required him to visit the patient four or five times and each time he did so with at least one of his residents present. Plaintiffs' counsel asked Dr. Bolaños about some inconsistencies in the medical records

reviewed by defense counsel, focusing on the fact that some records contain only a resident's signature, some are countersigned by him in addition to a resident, and some signatures are from unknown providers. Regarding these documents with an unknown signature, Dr. Bolaños explained that the Hospital had a policy in the past that required nurses to sign the medical consultation documents to confirm that they read the document. Although not certain, Dr. Bolaños expressed those signatures could well be of Hospital personnel, like nurses. He further explained that even though a record may contain only a resident's signature, it does not necessarily mean he was not present with the resident at the time the resident visited the patient or not otherwise consulted. He testified that the residents cannot sign notes in the record unless he is present with the resident or the resident consults with him.

The Court also finds Dr. Bolaños to be credible. He spoke confidently and clearly and was not defensive or rattled by plaintiffs' counsel's cross examination. He had a clear command of the information to which he testified. He confidently indicated when he did not know an answer to a question, and explained changes in policy that may have clouded his memories from the patient's case on certain points. He does have a stake in the outcome of this case as one of the co-defendants.

Dr. Bermúdez testified next. He explained that he is a cardiologist, has been with the Hospital since 1999, and has been a member of the University's faculty since 2010. He joined the residency teaching program in 2015. He testified that he has one third-year resident rotate with his supervision at a time. He recalled the resident under him during the patient's time at the

Hospital was Dr. Ruben Green-Colón. He stated that the resident takes care of the cardiology patients under his supervision, although that supervision may be indirect. He noted that third-year residents are very competent to handle a fair amount of tasks on their own, as a result of completing certain milestones in their training. He explained that indirect supervision of his residents involves the resident informing him of their decisions, assessing their decisions, offering recommendations, and addressing any doubts or concerns the resident may have. Every day, Dr. Bermúdez discusses all of the patients under his care with his resident, addressing next steps, set-backs, progress, etc., before they go on rounds together in the Intensive Care Unit. He indicated that all of this is written in the patient's medical record.

During cross-examination, Dr. Bermúdez clarified that he renewed his contract with the Hospital, ensuring his participation in the internal medicine residency program from July 2014 through June 2015. **Exhibit 7.** He explained that the Hospital only recently developed a stand-alone cardiology residency program; beforehand, cardiology was a rotation within the internal medicine residency. In a similar approach as the one undertaken during cross examination of Dr. Bolaños, plaintiffs' counsel walked through several pages of medical records with Dr. Bermúdez, verifying whether and where his countersignature or original signature appeared on the medical records of the patient, Irma Santiago. *See* **Exhibit 8.** Several times he described the signature under question as his own. Specifically, he confirmed that the Progress Notes from the patient's record marked as pages 18, 21, 28, were signed by the resident under his supervision, Dr. Green, without his countersignature, while he personally completed and signed

the records at pages 26, 33, 49. **Exhibit 8**. He testified that the residents cannot sign anything without consulting him and indicated that he was aware of his resident's notes in the medical record, regardless of whether or not those documents contained his own signature.

Dr. Bermúdez was very credible. He spoke confidently and clearly and was not defensive or rattled by any of the questions posed to him. Dr. Bermúdez had a clear command of the information to which he testified. He explained the inconsistency noted by plaintiffs' counsel, as to how he could have been involved in the cardiology residency program in 2015 when the program did not exist until recently created as an independent residency program or rotation. Dr. Bermúdez does have a stake in the outcome of this case as one of the co-defendants.

Last, Dr. Valentín testified. She offered general testimony as to the functioning and history of the residency program at the Hospital. She explained the significance and importance of having all of the Hospital's residency programs approved by the Accreditation Council for Graduate Medical Education ("ACGME"). According to Dr. Valentín, ACGME approval means that the Hospital's residency programs have maintained certain high standards, including very specific standards pertaining to the supervision of each level of resident. Under those standards, an attending physician is permitted to offer direct and indirect supervision and oversight, based on the milestones met by each individual resident. Before a resident can move onto the next milestone, they must attain certain grades on the objectives established by the residency program.

Dr. Valentín also explained that the medical residents are technically employees with the Puerto Rico Department of Health, being required to sign a contract with the Department of Health rather than the Hospital. The Hospital, in turn, provides the faculty, rest areas, educational space, space for meetings, conference rooms, trainings, and tools for residents' evaluations. Further, she explained that because the Hospital is a teaching hospital, every patient admitted to the Hospital or treated in the emergency room is informed that they will or may come into contact with medical residents during the course of their medical treatment. For example, Dr. Valentín explained that the entire emergency program at the Hospital is run by residents and medical students. She testified that patients are informed of this fact upon their entry to the Hospital. Actually, upon admission the patient's consent is sought by means of a document entitled, "Consent to Treatment," that is provided. The Form indicates:

> By reading this document, I come to the knowledge that the San Lucas Episcopal Hospital has agreements on academic affiliation and collaboration with educational institutions and that there is the possibility that there are doctors, nurses and other health professionals in training that intervene in the care of my health. I agree that these professionals provide me with health care, under corresponding supervision.

**Exhibit 11; ECF No. 112** (certified translation). Dr. Valentín was able to identify the patient's January 19, 2015 signed Consent to Treatment Form (in the Spanish language),[2] indicating that the patient had agreed to allow medical residents to participate in her care under their

---

[2] While the relevant part of the Consent to Treatment Form was translated for the record by an interpreter, the Court provided defendants with three days to provide a certified translation of this document. Defendants have complied. **ECF No. 112**.

corresponding supervisors. Lastly, Dr. Valentín testified that not every patient is admitted to or come into contact with the Hospital's teaching program and not all doctors with admitting privileges at the Hospital are part of the educational residency program.

Dr. Valentín further confirmed the identity and residency levels of the residents assigned to Dr. Bolaños and Dr. Bermúdez during the patient's hospitalization in this case. She indicated that every day, including the timeframe during which the patient was admitted at the Hospital, the Hospital was acting as an academic medical center.

Dr. Valentín's testimony was clear, credible, and thorough. She spoke confidently and had a clear command of the information to which she testified. The witness does have a tangential stake in the outcome of this case to the extent it confirms or undermines her understanding of how the RAMC statutory cap on damages operates in relationship to her and the medical and teaching entities with which is she is affiliated.

## II. Legal Standard

This issue before the Court is the interpretation and application of the RAMC statute. That statute provides, as follows,

> The limits imposed in §§ 3077 et seq. of Title 32, shall be extended to the Regional Academic Medical Centers, the students, physicians in postgraduate training and the faculty members thereof, for the medical procedures practiced in said Centers in the exercise of their teaching duties. Said limitation establishes a maximum of $75,000 for damages suffered by a person and up to $150,000 when the damages were suffered by more than one person or when there are several causes for action to which a single injured party is entitled. The stipulations in the fifth paragraph of § 4105 of Title 26 shall also be extended to the consortium.

P.R. Law Ann. tit. 24 § 10035. Because the parties agree that the Hospital is part of the RAMC, the only issue is whether the care rendered by Dr. Bolaños and Dr. Bermúdez was administered "in the exercise of their teaching duties." *See supra* n. 2.

"Statutory construction in Puerto Rico begins with the text of the underlying statute, and ends there as well if the text is unambiguous." *In re Plaza Resort at Palmas, Inc.*, 741 F.3d 269, 274 (1st Cir. 2014). A court may also look to the legislative history to ensure the construction of a statute gives effect to the purpose behind its creation because "[l]aws must be construed and applied in keeping with the social aims that inspired them, without divorcing them from reality and the human issues they intend to solve." *Claro TV y Junta Regl. Tel v. One Link,* 179 D.P.R. 177, 2010 P.R. Offic. Trans. 89 (2010) (alteration in original).

## III. Analysis

The uncontroverted testimony among these witnesses is that medical residents, including those involved in the patient's care, cannot administer medical care outside of their role as "students" in the residency program. Thus every decision the residents make is supervised, directly or indirectly, by the assigned attending physician. While some of the medical records do not bear the signatures of the attending physicians, it seems the undisputed structure of the residency program is that a resident, by sheer operation of being a medical resident, is offering treatment in conjunction with the Hospital's and their attending physician's exercise of their teaching duties. Dr. Valentín testified that the Hospital's residency programs, including the supervision structure, complies with ACGME national accreditation requirements.

Dr. Bolaños and Dr. Bermúdez confirmed they remembered treating the patient, and discussing her case with their residents, directly or indirectly. They each walked through the admitted segments of the patient's medical record, which inconsistently bear their countersignature or primary signature, and explained how this makes no difference. They explained that the signatures or countersignatures have no bearing on whether they attended to the patient directly or indirectly with the undersigned resident because the resident is simply not authorized to create any of these records without supervision.

The structure of the residency program described at the evidentiary hearing also adheres to the spirit of the RAMC statute, which is to "develop and strengthen a comprehensive public health system . . . by offering and providing cost-effective, accessible and quality health services to all persons equally, . . . [while also] develop[ing] and strengthen[ing] educational programs for health professionals." P.R. Laws Ann. tit. 24, § 10033. To reach this goal, the statute imposes a cap on damages for "Regional Academic Medical Centers, the students, physicians in postgraduate training and the faculty members thereof, for medical procedures practiced in said Centers in the exercise of their teaching duties." *Id*. § 10035; *Cedeño v. Sur Med Medical Center*, 977 F.Supp.2d 115, 117 (D.P.R. 2013). The limitation in the statute restricting the cap to care rendered "in the exercise of their teaching duties," is satisfied in the present case as to the care rendered by Dr. Bolaños, Dr. Bermúdez, and their assigned residents. The consistent, credible testimony from the witnesses was that all medical care rendered by Dr. Bolaños, Dr. Bermúdez,

and their assigned residents was in conjunction with Dr. Bolaños and Dr. Bermúdez's teaching duties.

During a telephone conference held on August 16, 2018, the Hospital argued that the cap on damages applies to it for all care rendered in this case, including the care rendered by Dr. Báez. The Hospital cited P.R. Laws Ann. tit. 32, § 3077, for support.

The Court disagrees. There is no evidence in the record that Dr. Báez is a part of the Hospital's teaching staff or rendered care to the patient in conjunction with any teaching duties. Dr. Báez did not appear at the evidentiary hearing, join the partial motion for summary judgment, or assert in his answer to the complaint that he is subject to the RAMC statute's cap on damages like the other defendants did. **ECF No. 91** at 2 & n.1. Dr. Báez is not eligible for the RAMC cap. Likewise, the Hospital may not claim the cap in conjunction with Dr. Báez's care where there is no indication that his care occurred within the ambit of the Hospital's teaching activities. *See Cedeño v. Sur Med Medical Center*, 977 F.Supp.2d 115, 118 (D.P.R. 2013) (noting that RAMC statute's protections are limited "to the hospital's teaching activities, . . . not all activities carried out within its premises").

Moreover, section 3077 explicitly limits its cap on damages to "medical and hospital malpractice of the healthcare professionals working in the areas of obstetrics, orthopedics, general surgery or trauma." There is no indication that the care the patient received from Dr. Báez fell within those narrow categories. This provision does not change the analysis in this case.

Whether the cap applies to the Hospital still boils down to the "teaching duties" language.

*See* P.R. Laws Ann. tit. 24, § 10035 ("The limits imposed in §§ 3077 et seq. of Title 32, shall be extended to the Regional Academic Medical Centers . . . for the medical procedures practiced in said Centers in the exercise of their teaching duties."). The legislative history of the RAMC statute and the statement of purpose for the title under which the RAMC statute is codified, reinforce that the RAMC program is limited to developing and maintaining accredited residency programs on the island. *See id.* (enacted by S.B. 985, Act of July 27, 2006, No. 136). As the Court ruled in its Opinion and Order denying partial summary judgment, dated June 26, 2018, **ECF No. 91**, the RAMC statute requires a showing that the challenged medical care fell within the teaching responsibilities of the parties seeking to benefit from the cap. The Hospital has failed to timely argue and has failed to demonstrate how it may benefit from the cap in relation to the undisputedly non-educational care administered by Dr. Báez, despite having many opportunities to do so—in summary judgment proceedings, after conducting additional discovery, and after participating in an evidentiary hearing on the matter. Accordingly, the Hospital may not benefit from the statutory cap in relation to any of the challenged care that was administered outside of the exercise of teaching duties.

The RAMC statute limits recovery to "a maximum of $75,000 for damages suffered by a person and up to $150,000 when the damages were suffered by more than one person or when there are several causes for action to which a single injured party is entitled." P.R. Laws Ann. tit. 24, § 10035. This renders these defendants immune "for damages in excess of $75,000 by each plaintiff and in excess of $150,000 for all damages alleged by all parties and by all causes of

actions in the complaint." *Kenyon v. Hosp. San Antonio, Inc.*, 2017 WL 3610564 (D.P.R. 2017) (slip copy). In other words, "the compensation for all the damages caused by a negligent action or omission may not exceed the sum of one hundred and fifty thousand dollars ($150,000), independent of the number of parties harmed." *Rivera-Muñoz v. Hospital Episcopal San Lucas, Inc.*, 87 D.P.R. 453, 2015 WL 3489474, at *11–12 (2015) (official translation available at **ECF No. 65-13**).

### III. Conclusion

The RAMC cap on damages applies to the Dr. Bolaños, Dr. Bermúdez, and the Hospital as it pertains to care rendered at the Hospital in accordance with teaching duties.

**SO ORDERED**.

At San Juan, Puerto Rico, on this 20th day of August, 2018.

                                                **S/AIDA M. DELGADO-COLÓN**
                                                **United States District Judge**